UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| *ex rel* MISTY BARROS-CLYMO, ) | |
| Plaintiffs, ) | |
| ) | Index No.: 14 cv-6036 |
| v. ) | |
| SCOTT WILKINS, BARBARA WILKINS ) | |
| and YLIME LLC, ) | |
| Defendants ) | |

## FIRST AMENDED COMPLAINT

### I)   PRELIMINARY STATEMENT

1.     Qui Tam plaintiff Misty Barros-Clymo is age 35 and resides in Avoca, Steuben County, New York.  She signed a one year lease to rent a manufactured home from Defendant Scott Wilkins beginning on January 1, 2013.  Ms. Barros-Clymo received rental assistance through the Housing Choice Voucher Program (HCVP) beginning in January 2013.

2.     The HCVP is administered by local Public Housing Agencies (PHAs).  The purpose of this program is to provide low-income families with safe, affordable housing. Affordability is achieved through payment of federal funds of a portion of a tenant's rent. Under the HCVP, tenants are required to pay the remaining share of the rent according to a formula based on the tenant's income and household size.  Plaintiff Barros-Clymo's share of the rent

1

under this formula ranged from zero to seventeen dollars per month during 2013. The HCVP paid the remaining rent.

3.     Maintenance of affordable housing through the HCVP requires landlords to collect only the rent set forth in the agreement with the PHA and the lease. To this end, landlords sign an agreement with the PHA certifying that they will not collect any additional rent.

4.     Defendant Scott Wilkins signed both a lease agreement with Plaintiff Misty Barros- Clymo and a Housing Assistance Payment Contract ("HAP") with Arbor Housing and Development, a public housing agency ("PHA"). Under both of these agreements, the contract rent was $385 per month.

5.     During the term of the lease, Defendants repeatedly and unlawfully demanded rent payments from Plaintiff Barros-Clymo of $165 per month, despite the fact that the PHA had paid contract rent in full for all months in 2013, excluding September and October, when Plaintiff Barros-Clymo had a rent share of $17 per month. The Defendants repeatedly threatened Plaintiff Barros-Clymo with eviction and loss of her housing assistance if she failed to make payments of $165 per month.

6.     Plaintiff Barros-Clymo succumbed to these repeated threats and made additional payments of $165 each month, of the ten months from January, 2013 through October 2013.

7.     When the PHA learned that Defendants had collected excess rent from Plaintiff Barros-Clymo, it suspended Plaintiff's housing assistance payments and demanded that Defendant Scott Wilkins return the excess rent that Defendants had collected.

8. Arbor Housing and Development, by letter dated January 29, 2014, stated that it had terminated the HAP contract with Defendant Scott Wilkins, effective January 31, 2014, and that, as a result, Plaintiff Barros-Clymo was required to move to a new rental unit in order to continue her voucher.

9. This Action is brought under the False Claims Act, 31 U.S.C. § 3729 *et seq*, New York General Business Law § 349, as well as New Yorks State's contract and tort law.

10. Plaintiff Misty Barros-Clymo seeks damages under the federal False Claims Act, including civil penalties, treble damages and attorneys' fees and costs. She is also seeking damages for Defendant's violation of General Business Law § 349, which prohibits deceptive acts in the conduct of any business, trade, or commerce. Plaintiff Barros-Clymo is also seeking damages for fraud and breach of contract, both of which have resulted in the cessation of voucher payments to Defendants, which will require Plaintiff to incur relocation costs if she is able to locate suitable replacement housing.

## II) PARTIES

11. Plaintiff Misty Barros-Clymo resides 8048A Kanona Rd, Avoca, NY ("the Premises"). On or about January 1, 2013, she signed a lease for rental of the premises with Defendant Scott Wilkins.

12. Plaintiff United Stated of America is *ex rel* Misty Barros Clymo.

13. Defendant Scott Wilkins signed the rental agreement with Plaintiff Misty Barros-Clymo and the HAP contract with the PHA.

14. Defendant Barbara Wilkins is an agent of Scott Wilkins and participated in the unlawful demand for and collection of excess rent.

3

15.     Defendant YLIME LLC is a domestic Limited Liability Company located in Steuben County, New York and lists Defendant Scott Wilkins as its registered agent for service of process. YLIME LLC owns the Premises.

**III)   JURISDICTION**

16.     This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. §§1345, 1331 and 31 U.S.C. § 3732.

17.     This Court also has supplemental jurisdiction over the state claims, pursuant to 28 U.S.C. § 1367.

**IV)   STATEMENT OF FACTS**

**A.     Defendant Scott Wilkins signed agreements with the Plaintiff and the Public Housing Agency to accept rent for the Premises in the amount of $385 per month.**

18.     Plaintiff Misty Barros-Clymo received a Housing Choice Voucher under the federal Section 8 program which assists low-income tenants in maintaining safe, affordable housing. This program is enacted by Section 8 of the US. Housing Act of 1937, 42 U.S.C. §1437f. The program is governed by regulations contained in 24 C.F.R. part 982.

19.     Under the Section 8 program, the Federal Government, through the Department of Housing and Urban Development ("HUD"), provides funds to local PHAs, which in turn, enter into Housing Assistance Payments ("HAP") contracts with landlords to make payments of a portion or all of the contract rent.

20.     Contract rent levels are based on fair market value rent as determined through a process governed by HUD regulations.

21. The PHA cannot provide housing assistance if the rent exceeds the reasonable rent as determined by the PHA. 24 C.F.R. § 982.507.

22. Under the HAP contracts, the PHA pays a portion of the tenant's rent each month based on the tenant's income, and the tenant is responsible for paying any remaining share of the rent.

23. Defendant Scott Wilkins signed the HAP contract on January 8, 2013, indicating initial rent to the owner of $385, which could not be raised during the initial term of the lease. The initial term of the HAP contract was January 1, 2013 through December 31, 2013. (EXHIBIT A)

24. Defendant Scott Wilkins also signed a one year lease with Plaintiff Misty Barros-Clymo on January 1, 2013, which set monthly rent at $385. (EXHIBIT B)

25. Under Section 8(d) of the HAP contract, Defendant Scott Wilkins certified that "Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term."

26. Under 24 C.F.R. §982.451(b)(4)(ii), the Defendants were prohibited from demanding any rent exceeding the "rent to owner" listed in the HAP contract, which was $385.

**B.     Plaintiff's share of the rent totaled $34 for all of the months from January 2013 through January 2014.**

27. In February of 2013, the PHA determined that Plaintiff's share of the rent was zero dollars per month (EXHIBIT C)

28. On July 23, 2013, the PHA determined that Plaintiff's share of rent was $50 per month, effective September 1, 2013. (EXHIBIT D)

29.     On July 26, 2013, the PHA corrected the Plaintiff's share of rent to $17 per month, effective September 1, 2013. (EXHIBIT E)

30.     On October 17, 2013, the PHA determined that Plaintiff's share of the rent was zero dollars per month, effective November 1, 2013. (EXHIBIT F)

31.     Therefore Plaintiff only owed a portion of the contract rent of seventeen dollars for the months of September and October of 2013. For the remaining months, the PHA paid the full rent of $385. (EXHIBIT G)

32.     Therefore for the entire year 2013, the PHA made total rent payments of $4,586.00, leaving a total tenant share for all of 2013 of $34.00.

33.     The PHA also issued payment to Defendants of $385 for the month of January, 2014. (EXHIBIT H)

**C.      During 2013, Defendants demanded and received $1,650 from Plaintiff, plus several $40 late fee charges, instead of the $34 the Plaintiff was required to pay during that period under the HAP contract and the lease.**

34.     After signing of the lease and HAP contract, and throughout the year 2013, beginning in January, Defendants informed Plaintiff Barros-Clymo that she was required to pay an additional $165 every month, above the payments which the PHA made.

35.     When Plaintiff questioned the Defendants regarding her rent share notices from the PHA, they informed her that these notices were in error and that she was required to pay the full $165 each month.

36.     The Defendants notified the Plaintiff that she would be evicted if she failed to make these additional rent payments in full.

37.     In fear of losing her housing, Plaintiff Misty Barros-Clymo made these extra payments from January to October of 2013, and also paid approximately five late fees of $40

6

each, despite the fact that her contract rent had been paid in full by the PHA, with the exception of September and October 2013, when she was required to pay only $17 per month.

38.     Plaintiff Barros-Clymo refused to pay any additional rent for the months of November or December of 2013.

39.     In November of 2013, Defendant Barbara Wilkins left Plaintiff Barros-Clymo a voice message stating that Plaintiff would lose her housing assistance voucher if she failed to pay rent, despite the fact that the PHA had already paid the Plaintiff's rent in full for November 2013 and the contract rent has been paid in full for all prior months.

40.     On December 6, 2013, Plaintiff Barros-Clymo received a "Three (3) Day Notice to Pay Rent or Quit" from Defendant YLIME, LLC which demanded $165 in additional rent for each of November and December 2013, as well as two $40 late fees and a $40 "service fee." (EXHIBIT I) When this notice was delivered, the PHA had already paid the contract rent in full for November and December 2013.

41.     Arbor Housing and Development notified Defendant Scott Wilkins by letter dated December 11, 2013, that he was required to repay Plaintiff Barros-Clymo all rent he had collected from Plaintiff with the exception of the $34 which represented her rent share for September and October 2013. (EXHIBIT J)

42.     Defendants failed to refund Plaintiff Barros-Clymo her excess payments.

43.     Nonetheless, and despite Plaintiff's substantial overpayments during 2013, Defendant YLIME LLC again demanded additional rent for the month of January 2014, by issuance of a new "Three (3) Day Notice to Pay Rent or Quit" (EXHIBIT K).

44.     On January 29, 2014, the PHA notified Ms. Barros-Clymo that in order to continue to receive rental assistance she would need to move from her current rental unit, because the PHA had terminated its HAP contract with Defendant Scott Wilkins  (EXHIBIT L).

## V.  CAUSES OF ACTION

### A.    Violation of Federal False Claims Act

45.     31 U.S.C. § 3729 renders any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" liable for damages ranging from $5,000 to $10,000 per instance, plus three times actual damages.  These penalties are adjusted for inflation.

46.     31 U.S.C. § 3730(b) allows private persons, such as relator Misty Barros-Clymo, to bring civil actions alleging violations of the False Claims Act in the name of the government. The Qui Tam plaintiff is also eligible to receive reasonable attorney's fees and costs in connection with bringing this action.  31 U.S.C. § 3730(d).

47.     In signing the HAP contract, Defendant Scott Wilkins expressly certified to the PHA that he would not receive any payments exceeding those payable as rent to owner.

48.     The total rent due on the premises during 2013 was $385 per month, which totals $4,620 per year.  Defendants instead demanded and collected rent totaling $6,236 during 2013 resulting in an overpayment of $1,616.

49.     Defendants demanded and received additional payments from Plaintiff after Defendant Scott Wilkins falsely certified that Defendants would not receive rent exceeding $385 per month.

50.     On information and belief, the PHA would not have made any payments of assistance had Defendants refused to sign the HAP contract, and in particular agreed to the explicit prohibition of payments exceeding the amount of rent.

51.     On information and belief, the PHA relied on this certification in extending payments of government funds for Plaintiff's rental of the Premises.

52.     Each payment made by the PHA and accepted by Defendants during the period that Defendants collected or demanded additional payments from Plaintiff Barros-Clymo constitutes a separate false claim, because Defendant Scott Wilkins had falsely certified that he would not receive any other consideration for rental of the Premises.

53.     Therefore in collecting payments of rent which exceeded the Rent to owner, Defendants unlawfully received payments from the PHA which were extended in reliance on Defendant Scott Wilkins' certification that he would accept rent totaling $385 per month.

54.     The government was damaged by the extent of its payments upon Defendants' false claims for excessive rent, equaling $4,971.

55.     In the alternative, the government's damages are the amount of Plaintiff Misty Barros-Clymos unrecouped overpayments to Defendants, totaling $1,616, Coleman v. Hernandez, 490 F. Supp. 2d 278 (U.S. Dist. Ct. 2007), plus all late fees collected.

**B.     Violation of General Business Law § 349**

56.     New York State General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce. . ."

57.     Defendants' acts of demanding and collecting rent in excess of contract rent were deceptive and unlawful.

9

58.     Defendants' further use of threats of eviction and loss of federal benefits to extract the excess payments are an element of this ongoing pattern of deceptive practices.

### C.     Breach of Contract

59.     Defendant Scott Wilkins signed both a contract with the PHA and a lease with Plaintiff Barros-Clymo providing for rent of $385 per month.

60.     In demanding rent exceeding $385 per month during the term of the lease, Defendants refused to perform the contract according to its terms.

61.     The threats of eviction and threats that Plaintiff would lose her voucher constituted anticipatory breach of the terms of the contract.

62.     Plaintiff Barros-Clymo's overpayment of $1,616 was foreseeable damage from the Defendants' breach of the contract.

63.     It was also foreseeable that the PHA would terminate the HAP contract with Defendants as a result of this breach.

64.     On information and belief, if Defendants had not breached the contract, the PHA would have continued the HAP contract and the rent payments on behalf of Plaintiff Barros-Clymo.

65.     If Defendants had not breached the contract, Plaintiff Barros-Clymo would not be required to relocate due to termination of the HAP contract, and would not incur costs in connection with this relocation.

### D.     Fraud

66.     Defendant Scott Wilkins represented orally and in writing that the rent for the premises was $385 per month.

67.     To the extent that Defendants intended to charge rent exceeding $385, they knew that the stated rent amount was false.

68.     Defendant Scott Wilkins stated that the rent was $385 in order to deceive Misty Barros-Clymo and cause her to sign the lease.

69.     Plaintiff Misty-Barros Clymo relied on Defendant Scott Wilkins's oral and written agreements that rent was $385 in signing her lease and requesting that Housing Choice Voucher payments be directed to Defendants.

70.     After signing the lease and HAP contract, Defendants knowingly charged, demanded and collected rent exceeding the rent that Scott Wilkins agreed to accept as rent to owner.

71.     Plaintiff was injured by this fraud to the extent of her excess payments as well as the termination of the HAP contract and any resulting relocation costs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Misty Barros-Clymo and the United States of America respectfully request the following relief:

a.      Find that the Defendants violated the False Claims Act and are liable to the United States of America.

b.      Assess civil penalties against the defendant for each separate violation of the False Claims Act of not less than $5,000.

c.      Award the United States three times the amount of damages that it sustained as a result of the Defendants' acts.

d.     Award Misty Barros-Clymo, the qui tam plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d).

e.     Award costs and reasonable attorney's fees to Misty-Barros-Clymo.

f.     Find that the Defendants Violated New York General Business Law § 349 and that Plaintiff is entitled to damages for such violation.

g.     Award damages for Defendants' breach of the lease contract and HAP contract.

h.     Award damages for Defendants' fraudulent misrepresentation of the rent for the Premises.

i.     Awarding such additional relief and further relief as the interests of justice require.

Dated: February 10, 2014
       Bath, New York

_____
LEGAL ASSISTANCE OF WESTERN NEW YORK, INC.
Attorneys for Plaintiff Misty-Barros-Clymo
David Kagle, of counsel
104 East Steuben Street
Bath, New York 14810
Tel: (607) 776-4126
Email: dkagle@lawny.org

12

# EXHIBIT "A"



**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

**Part A of the HAP Contract: Contract Information**

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**   Misty Barros Clymo

3. **Contract Unit**   8048 A Kanona Back Road
   Avoca, NY 14809

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.   Misty Barros Clymo
   Blake Barros
   Willow Barros

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): 01/01/2013
   The initial lease term ends on (mm/dd/yyyy): 12/31/2013

6. **Initial Rent to Owner**
   The initial rent to owner is: $ 385
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 385 per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.



form HUD-52641 (8/2009)
ref Handbook 7420.8

JAN 14 2013

**8.   Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|
| Heating | ☐ Natural gas | ☒ Bottle gas   ☐ Oil or Electric | | ☐ Coal or Other | T | T |
| Cooking | ☐ Natural gas | ☒ Bottle gas   ☐ Oil or Electric | | ☐ Coal or Other | T | T |
| Water Heating | ☐ Natural gas | ☐ Bottle gas   ☒ Oil or Electric | | ☐ Coal or Other | T | T |
| Other Electric | | | | | T | T |
| Water | | | | | O | O |
| Sewer | | | | | O | O |
| Trash Collection | | | | | T | T |
| Air Conditioning | | | | | T | T |
| Refrigerator | | | | | T | T |
| Range/Microwave | | | | | T | T |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**

HTFC / AHD
Print or Type Name of PHA

_Tracy Yerk_
Signature

Tracy Yerk          HCV Intake
Print or Type Name and Title of Signatory      Specialist

02/04/2013
Date (mm/dd/yyyy)

**Owner**

X _Scott Wilkins_
Print or Type Name of Owner

X _Scott Wilkins_
Signature

X _____
Print or Type Name and Title of Signatory

X 1/8/2013
Date (mm/dd/yyyy)

**Mail Payments to:**

_____
Name

_____
Address (street, city, State, Zip)

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

1.  **Purpose**

    a.  This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

    b.  The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

    c.  During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

    d.  The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2.  **Lease of Contract Unit**

    a.  The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

    b.  The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

    c.  The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

    d.  The owner certifies that:

        (1)  The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

        (2)  The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

        (3)  The lease is consistent with State and local law.

    e.  The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3.  **Maintenance, Utilities, and Other Services**

    a.  The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

    b.  The owner must provide all utilities needed to comply with the HQS.

    c.  If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies

for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

    d.  The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

    e.  The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

    f.  The PHA must notify the owner of any HQS defects shown by the inspection.

    g.  The owner must provide all housing services as agreed to in the lease.

4.  **Term of HAP Contract**

    a.  **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

    b.  **When HAP contract terminates.**

        (1)  The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

        (2)  The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

        (3)  If the family moves from the contract unit, the HAP contract terminates automatically.

        (4)  The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

        (5)  The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

        (6)  The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

form HUD-52641 (8/2009)
ref Handbook 7420.8

JAN 14 2013

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a

tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9.   Prohibition of Discrimination. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10.   Owner's Breach of HAP Contract

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11.   PHA and HUD Access to Premises and Owner's Records

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12.   Exclusion of Third Party Rights

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

form HUD-52641 (8/2009)
ref Handbook 7420.8

13. **Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

14. **Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

16. **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

    a.   The HAP contract contains the entire agreement between the owner and the PHA.

    b   The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

# Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

JAN 1 4 2014

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

1.  **Section 8 Voucher Program**

    a.  The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

    b.  The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2.  **Lease**

    a.  The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

    b.  The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3.  **Use of Contract Unit**

    a.  During the lease term, the family will reside in the contract unit with assistance under the voucher program.

    b.  The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

    c.  The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

    d.  The tenant may not sublease or let the unit.

    e.  The tenant may not assign the lease or transfer the unit.

4.  **Rent to Owner**

    a.  The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

    b.  Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

    c.  During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

        (1)  The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

        (2)  Rent charged by the owner for comparable unassisted units in the premises.

5.  **Family Payment to Owner**

    a.  The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

    b.  Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

    c.  The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

    d.  The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

    e.  The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

    f.  The owner must immediately return any excess rent payment to the tenant.

6.  **Other Fees and Charges**

    a.  Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

    b.  The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

    c.  The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7.  **Maintenance, Utilities, and Other Services**

    a.  Maintenance



(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**
(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
(a) Pay for any utilities that are to be paid by the tenant.
(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
(1) Serious or repeated violation of the lease;
(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
(3) Criminal activity or alcohol abuse (as provided in paragraph c); or
(4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**
(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
(c) Any violent criminal activity on or near the premises; or
(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**
(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
(2) During the initial lease term or during any extension term, other good cause may include:
(a) Disturbance of neighbors,
(b) Destruction of property, or
(c) Living or housekeeping habits that cause damage to the unit or premises.
(3) After the initial lease term, such good cause may include:
(a) The tenant's failure to accept the owner's offer of a new lease or revision;
(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
(4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
(5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

form HUD-52641 (8/2009)
ref Handbook 7420.8

JAN 1 4 2013

provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

e.  **Protections for Victims of Abuse.**

(1)  An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2)  Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3)  Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4)  Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5)  Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6)  Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7)  Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.  **Eviction by court action.** The owner may only evict the tenant by a court action.

g.  **Owner notice of grounds**

(1)  At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2)  The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3)  Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9.  **Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

10.  **PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11.  **Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

12.  **Security Deposit**
a.  The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.  When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.   The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.   If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13.  Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14.  Conflict with Other Provisions of Lease

a.   The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b.   In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15.  Changes In Lease or Rent

a.   The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b.   In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2)  If there are any changes in lease provisions governing the term of the lease;

(3)  If the family moves to a new unit, even if the unit is in the same building or complex.

c.   PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d.   The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16.  Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17.  Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

# EXHIBIT "B"



*794-4615 misty*
*Sister 774-2058*

# WILKINS PROPERTIES AND MANAGEMENT

## FIXED/TERM LEASE

This agreement is entered into on *4/1/13* [date] between *SCOTT M. WILKINS* hereinafter referred to as "landlord" and *Misty Barrios Cejuno*

[list the name of each and every occupant authorized to live in property], referred to as "tenant."

1.   PREMISES. Landlord rents to tenant those premises commonly known and referred to as *8045 Kennedy Back Rd* [address], _____ [APT. NO.], *Avoca NY* [City/State], for use and occupancy as a residence for aforestated individuals only. No other persons may occupy the premises without the express written consent of landlord obtained in advance. Said tenancy shall commence on *4-1-13* [date of commencement of tenancy] and continue for a period of one year [or such other period upon which the parties have agreed].

2.   RENT. Tenant shall pay to landlord rent in the amount of $ *385* [amount of rent] in advance on the first day of each calendar month. Rent for the period from the commencement of this lease to the last day of the month of _____ [last day of the month the lease commenced] prorated in the amount of $ _____ [amount of prorated rent] has been paid upon signing of this rental agreement. In the event the first day of the month is a legal holiday, then the rent shall be due and payable on the first business day thereafter. Rent not paid in accordance with this paragraph shall be deemed in default.

3.   LATE CHARGES. In the event the rent shall not be paid in full by the fifth day of the month, or in the event that a check tendered for the rent shall be for any reason dishonored, then, in either of those events, a late charge shall accrue in the amount of $ *40⁰⁰* [amount of late charge] which shall be due and payable forthwith in addition to any rent unpaid.

4.   SECURITY DEPOSIT. Tenant has deposited with landlord the sum of $ *550⁰⁰* [amount of security deposit] as and for a security deposit. Said deposit may be applied by landlord to any purpose permitted by law and upon termination of this agreement accounted for according to law. No part of said deposit shall be deemed a last month rent, or rent for any particular month, nor shall it be applicable to any particular obligation arising out of this agreement at the request of tenant. In the event landlord shall, in his discretion, use any portion of the deposit for a purpose permitted by law during the life of this agreement, then tenant shall replenish the same to its original amount upon written notice form landlord to do so.

5.   UTILITIES. Tenant shall pay all utilities except *NONE* *She pays propane and* [list any utilities which are the responsibility of the landlord], *Electric* which shall be maintained by landlord.

6.   PARKING AND STORAGE. Tenant may occupy up to *2* [number of parking spaces assigned] off street parking spaces, designated in the parking and storage space assignment attached hereto. Off street parking may not be used for storage or parking of unserviceable vehicles or for working

*EXHIBIT B*   *F-- Addendum*



on vehicles. Any such use of off street parking shall be deemed a breach of this agreement. Such storage space or facilities, if any, assigned to tenant in the parking and storage space assignment attached hereto, is provided for tenant's use during the life of this agreement only, and shall promptly be surrendered to the landlord upon termination of this agreement.

7.      ASSIGNMENT AND SUBLETTING. Tenant may not assign or sublet the whole or any part of the premises rented to him hereunder.

8.      CONDITION OF PREMISES. Tenant has inspected the premises, including all appliances and furnishing supplied therewith, and acknowledges the same to be in good order and repair, unless noted to the contrary on landlord's copy of this agreement. Upon surrender of possession of the premises by tenant, tenant shall return the said premises and all appliances and furnishings supplied therewith clean and in at least as good a condition as they were received by tenant, normal wear and tear excepted. Burns, stains, holes, or tears of any size or kind in the carpeting, draperies, curtains, or walls shall not constitute normal wear and tear. Tenant acknowledges that no representations have been made to him by landlord with respect to landlord's intentions with respect to any improvements, alterations, decorations, or repairs to the premises except as may otherwise be noted in this agreement.

9.      ·MAINTENANCE AND REPAIR. During the life of this agreement, tenant shall keep the premises in clean and sanitary condition; dispose of all rubbish, garbage and waste promptly and in a clean and sanitary manner; properly use and operate all electrical, gas and plumbing fixtures and keep the same in clean condition; not permit any person in or about the premises with tenant's permission to deface, damage or remove any part of the structure of the premises or the facilities, equipment or appurtenances thereto, nor personally do such things; occupy and use the premises in accord with the purpose for which they were rented to him. Tenant shall be responsible for all expenses in connection with any repairs caused by tenant's failure to comply with the foregoing conditions. Notwithstanding the foregoing, it is landlord's obligation to maintain the premises in a habitable condition. However, landlord is not responsible for defective conditions caused by tenant's wrongful or negligent actions or inactions or those of any person upon the premises with tenant's permission.

10.     USE OF PREMISES. The premises are rented to tenant for residential purposes only. Neither tenant nor any person on the premises with his permission shall disturb, annoy, inconvenience or endanger other tenants in the building, or neighbors, whether such neighbors are tenants of the landlord or not. Tenant shall perform no alterations or redecorations of the premises without landlords prior written consent. Tenant shall comply with such Rules and Regulations, pertaining to use of common areas and other things, as may be distributed or posted by landlord from time to time. Failure to comply with such rules may be deemed a breach of this agreement at the discretion of the landlord. Such rules and regulations are provided with this agreement. Any alterations to such rules and regulations shall be deemed effective 30 days after delivery to tenant.

11.     PETS. No pets shall be brought on to the premises without landlord's prior written consent.

---

### FIXED TERM LEASE AGREEMENT

RECEIVED JAN 1 0 2013

13.    **MEGAN'S LAW NOTICE.**

"Notice: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a'900'-telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the '900' telephone service."

_ABC_ _____ [initials of all tenants].

14.    **LANDLORD'S ENTRY.** Landlord may enter the premises for the purpose of inspecting the same, or for any other purpose permitted by law, upon notice, under the provisions of applicable state law. Upon proper notice, such entry may occur during normal business hours, or at any time in the case of emergency, with or without the presence of tenant. Tenant shall not add or change any locks or security devices on the premises without landlord's prior written consent, and must, in the event of such change, forthwith provide to landlord a key or keys.

15.    **INSURANCE.** Landlord will not insure tenant against any personal injury or property damage, including that caused by an act or omission of any other tenant or third party, or by any criminal act or activity, or any other cause whatsoever. Tenant is responsible for procuring his own insurance.

16.    **NOTICES.** Service by landlord of any notice required or permitted by law upon any tenant signatory to this agreement shall be deemed service upon all such tenant signatories.

17.    **ABANDONMENT.** The premises shall be deemed abandoned by tenant if, after a failure by tenant to pay an installment of rent pursuant to the "RENT" paragraph hereof, or any portion thereof, for ny rental month, and after the date of service of a written notice on Tenant pursuant to applicable state law, demanding that tenant either pay the amount of rent then due or quit the premises, Tenant has been absent from the premises for a period of 14 consecutive days, and tenant has neither contacted landlord in person nor cured said rent default.

18.    **PERSONAL PROPERTY LEFT ON PREMISES.** After tenant vacates the premises, landlord may store any personal property left behind for a period of 30 days. If tenant fails to pick up said property within that time, during which time landlord shall surrender the same to tenant cost free, such property, regardless of its value, shall become the property of the landlord and may be retained by him or disposed of as landlord sees fit.

19.    **ATTORNEY FEES.** In the event of the institution of any proceedings to enforce this agreement or any part thereof, the prevailing party in such proceeding shall be entitled to a reasonable attorney fee.

20.    **WAIVER.** Landlord's failure to require strict compliance with the conditions of this agreement, or to exercise any right provided herein, shall not be deemed a waiver by landlord of such condition or right. Landlord's acceptance of rent with knowledge of any default under this agreement by tenant shall not be

---

FIXED TERM LEASE AGREEMENT

Jan 30 13 05:23p        Wilkins Dairy Farm                          6077764719              p.2

deemed a waiver of such default, nor shall it limit landlord's rights with respect to that or any subsequent default.

21.    WILLFUL HOLDING OVER. If tenant willfully and maliciously remains in possession of the premises after expiration or termination of the tenancy, landlord may recover up to six hundred dollars statutory damages in addition to any other remedy permitted by law for such withholding of possession.

22.    SERVICE OF NOTICES. Notices, demands and service of process may be served on landlord by service on the following individual at the following address during normal business hours

_____
(name and address of person authorized to accept service, which may be the landlord himself).

23.    PARTIES. For the purposes of this agreement, the term "landlord" includes the owner and any other person acting upon his behalf with his authorization. The term "tenant" includes all persons designated as such in this agreement. The use of the term "landlord" or "tenant" herein shall refer to all such, regardless of number or gender.

24.    SEVERABILITY. If any provision, or part thereof, shall be declared invalid, said invalidity shall not affect the balance of such provision, or any other provision hereof.

25.    WHOLE AGREEMENT. This document, including all attachments hereto, constitutes the entire agreement between the parties and supersedes any oral or written representations or agreements that may have been made by either party. Tenant represents that he has relied solely on his own judgment, experience, and expertise in entering into this agreement with landlord.

26.    APPLICATION TO RENT. Tenant has submitted an application to rent as an inducement to landlord to enter into this agreement. Landlord and tenant agree that landlord has relied upon the statements made in such application in making the decision to enter into this agreement. The application to rent is attached hereto and made a part hereof. Any material misrepresentation contained in said application shall constitute a non-curable breach of a material term of this agreement and may, in the landlord's discretion, be a ground termination of this agreement.

Date: _1/1/13_____        _Misty Baun Clymo_____
                                              Tenant's Signature

Date: _____        _____
                                              Tenant's Signature

Date: _____        _____
                                              Tenant's Signature

Date: _____        _____
                                              Tenant's Signature

Date: _____        _____
                                              Landlord/Agent's Signature

EARLY TERMINATION OF LEASE SHALL RESULT IN
FORFEITURE OF SECURITY DEPOSIT.
THIS LEASE SHALL AUTOMATICALLY RENEW ITSELF ONE
YEAR FROM THIS DATE UNLESS EITHER PARTY NOTIFIES
THE OTHER AT LEAST 30 DAYS PRIOR TO THAT DATE IN WRITING.

**FIXED TERM LEASE AGREEMENT**

X Misty Baun Clymo
    TENANT   SIGNATURE

X Pl_____

deemed a waiver of such default, nor shall it limit landlord's rights with respect to that or any subsequent default

RECEIVED JAN 1 8 2013

21.   WILLFUL HOLDING OVER. If tenant willfully and maliciously remains in possession of the premises after expiration or termination of the tenancy, landlord may recover up to six hundred dollars statutory damages in addition to any other remedy permitted by law for such withholding of possession.

22.   SERVICE OF NOTICES. Notices, demands and service of process may be served on landlord by service on the following individual at the following address during normal business hours

_____

[name and address of person authorized to accept service, which may be the landlord himself].

23.   PARTIES. For the purposes of this agreement, the term "landlord" includes the owner and any other person acting upon his behalf with his authorization. The term "tenant" includes all persons designated as such in this agreement. The use of the term "landlord" or "tenant" herein shall refer to all such, regardless of number or gender.

24.   SEVERABILITY. If any provision, or part thereof, shall be declared invalid, said invalidity shall not affect the balance of such provision, or any other provision hereof.

25.   WHOLE AGREEMENT. This document, including all attachments hereto, constitutes the entire agreement between the parties and supersedes any oral or written representations or agreements that may have been made by either party. Tenant represents that he has relied solely on his own judgment, experience, and expertise in entering into this agreement with landlord.

26.   APPLICATION TO RENT. Tenant has submitted an application to rent as an inducement to landlord to enter into this agreement. Landlord and tenant agree that landlord has relied upon the statements made in such application in making the decision to enter into this agreement. The application to rent is attached hereto and made a part hereof. Any material misrepresentation contained in said application shall constitute a non-curable breach of a material term of this agreement and may, in the landlord's discretion, be a ground termination of this agreement.

Date: 6/26/12 _____    _____
                        Tenant's Signature

Date: _____    _____
                        Tenant's Signature

Date: _____    _____
                        Tenant's Signature

Date: _____    _____
                        Tenant's Signature

Date: _____    _____
                        Landlord/Agent's Signature

* EARLY TERMINATION OF LEASE SHALL RESULT IN
  FORFEITURE OF SECURITY DEPOSIT
* THIS LEASE SHALL AUTOMATICALLY RENEW ITSELF ONE
  YEAR FROM THIS DATE UNLESS EITHER PARTY NOTIFIES
  THE OTHER AT LEAST 30 DAYS PRIOR TO THAT DATE IN WRITING.

**FIXED TERM LEASE AGREEMENT**

X _____
   TENANT SIGNATURE

# EXHIBIT "C"



P.O. Box 31          P.O. Box 451
Bath, NY 14810       Big Flats, NY 14814
T: 607-776-7664      T: 607-562-2477
F: 607-776-9118      F: 607-562-3856

**www.ArborDevelopment.org**

February 4, 2013

Scott Wilkins
5811 Unionville Rd
Bath, NY 14810

Dear Mr./Ms. Wilkins:

The lease between you and your tenant, Misty A Barros Clymo, has been approved and the Housing Assistance Payments (HAP) Contract will begin effective January 1, 2013.

Effective January 1, 2013 your tenants portion of rent will be $0 per month. Effective the same date, our Housing Assistance Payment to you will be $385 per month. On March 1, 2013 our payment to you will be $1,155. This includes our regular monthly payment of $385 plus $385 for each of the prior two months. This agency certifies that the Contract Rent of $385 is reasonable and the unit complies with HUD Housing Quality Standards.

Our Housing Assistance Payment to you will be paid via ACH/Direct Deposit. We are pleased to advise you of the system that has been implemented to provide you with individual payment details for each person included in your monthly Voucher Program disbursement.   As soon as ACH payments are scheduled and released, a web based application will provide you full and immediate access to this information.

Access to the remittance information is at the following link:

http://nysdhcr.gov/Apps/HCVAdvice/

Once on that web page, you will need to enter three pieces of information:

1) County Number: **51**
2) Landlord ID: **630**
3) Last Four Digits of Taxpayer Identification Number for the legal entity that will receive the year end IRS 1099 form (important – in cases of agents receiving payments on behalf of an owner, that may or may not be the same TIN for the entity receiving monthly HAP payments. If you are an agent, but not the one who will receive the 1099 for tax purposes, be sure to enter the last four digits of the legal entity who will receive the 1099 form).

We are excited about this enhancement and hope to find other means of making our Voucher Program payment process more effective, efficient and environmentally friendly.  If you have any questions or experience any difficulty in accessing payments via this system, please contact Alisa Parzych at 562-2477 Ext. 219.

Sincerely,

*Tracy York*

Tracy York

# EXHIBIT C

"Equal Housing Opportunity"





CHARTERED MEMBER          United Way of the Southern Tier

Building Independence. Creating Housing Options.

EXHIBIT "D"



P.O. Box 31       P.O. Box 451
Bath, NY 14810   Big Flats, NY 14814
T: 607-776-7664  T: 607-562-2477
F: 607-776-9118  F: 607-562-3856

## www.ArborDevelopment.org

July 23, 2013

Misty A Barros Clymo
8048 Kanona Rd Apt.A
Avoca, NY 14809

Dear Misty A Barros Clymo:

This is to advise you that there has been a change in the housing assistance payments as the result of:

_X_ A change in family income or composition
_____ An approved rent increase
_____ A change in the responsibility for utilities

|  | From | To | Effective Date |
|---|---|---|---|
| Housing Assistance Payment | $385 | $335 | September 1, 2013 |
| Tenant Rent | $0 | $50 | September 1, 2013 |
| Contract Rent | $____ | $____ | _____ |

If the housing assistance payment to your landlord increased and we have already paid your landlord for the month the change was effective, your landlord will receive the adjustment in the following months housing assistance payment.

Please remember that you must contact me within 2 weeks if:

1) Your household income changes. If all income is not reported, your rental assistance may be terminated and you will have to repay the money overpaid to your landlord on your behalf. Per HUD regulations, we will verify the information you report to us with the HUD Enterprise Income Verification System, the Social Security Administration and other income reporting agencies.
2) Your household members change.
     a) A household member moves out
     b) A birth or adoption. You must mail us a copy of the new member's Birth Certificate and Social Security Card within two weeks.
     c) If you want to add a member to your household who is 18 years of age or older you must notify us prior to them moving into your unit. We will require a criminal background check and your landlord's approval before we add them to your case.
3) You receive an eviction notice.

If you receive public assistance, food stamps, or Social Security Income (SSI), please report your new rent share to the Department of Social Services immediately. If you require a further explanation of this change, please call me at 562-2477 Ext. 231. If you disagree with this rent determination you may request an informal hearing in writing within 14 days from the date of this notice. Our hearing procedures are attached.

Sincerely,

*Kim Brucie*
Kim Brucie

Scott Wilkins
5811 Unionville Rd
Bath, NY 14810

EXHIBIT D




"Equal Housing Opportunity"
NeighborWorks® CHARTERED MEMBER
United Way

Building Independence. Creating Housing Options.

# EXHIBIT "E"


# Arbor

P.O. Box 31
Bath, NY 14810
T: 607-776-7664
F: 607-776-9118

P.O. Box 451
Big Flats, NY 14814
T: 607-562-2477
F: 607-562-3856

**www.ArborDevelopment.org**

July 26, 2013
**CORRECTION LETTER**

Misty A Barros Clymo
8048 Kanona Rd Apt.A
Avoca, NY 14809

Dear Misty A Barros Clymo:

This is to advise you that there has been a change in the housing assistance payments as the result of:

___X___ A change in family income or composition
_____ An approved rent increase
_____ A change in the responsibility for utilities

| | From | To | Effective Date |
|---|---|---|---|
| Housing Assistance Payment | $335 | $368 | September 1, 2013 |
| Tenant Rent | $50 | $17 | September 1, 2013 |
| Contract Rent | $_____ | $_____ | _____ |

If the housing assistance payment to your landlord increased and we have already paid your landlord for the month the change was effective, your landlord will receive the adjustment in the following months housing assistance payment.

<u>Please remember that you must contact me within 2 weeks if:</u>

1) **Your household income changes.** If all income is not reported, your rental assistance may be terminated and you will have to repay the money overpaid to your landlord on your behalf. Per HUD regulations, we will verify the information you report to us with the HUD Enterprise Income Verification System, the Social Security Administration and other income reporting agencies.
2) **Your household members change.**
    a) A household member moves out
    b) A birth or adoption. You must mail us a copy of the new member's Birth Certificate and Social Security Card within two weeks.
    c) If you want to add a member to your household who is 18 years of age or older you must notify us prior to them moving into your unit. We will require a criminal background check and your landlord's approval before we add them to your case.
3) **You receive an eviction notice.**

If you receive public assistance, food stamps, or Social Security Income (SSI), please report your new rent share to the Department of Social Services immediately. If you require a further explanation of this change, please call me at 562-2477 Ext. 231. If you disagree with this rent determination you may request an informal hearing in writing within 14 days from the date of this notice. Our hearing procedures are attached.

Sincerely,

*Kim Brucie*

Kim Brucie

Scott Wilkins
5811 Unionville Rd
Bath, NY 14810

**Building Independence. Creating Housing Options.**



"Equal
Housing
Opportunity"

**NeighborWorks**
**CHARTERED MEMBER**



# EXHIBIT "F"



ARBOR
HOUSING AND DEVELOPMENT

P.O. Box 31
Bath, NY 14810
T: 607-776-7664
F: 607-776-9118

P.O. Box 451
Big Flats, NY 14814
T: 607-562-2477
F: 607-562-3856

**www.ArborDevelopment.org**

October 17, 2013

Misty A Barros Clymo
8048 Kanona Rd Apt.A
Avoca, NY 14809

Dear Misty A Barros Clymo:

This is to advise you that there has been a change in the housing assistance payments as the result of:

__X__ A change in family income or composition
_____ An approved rent increase
_____ A change in the responsibility for utilities

| | From | To | Effective Date |
|---|---|---|---|
| Housing Assistance Payment | $368 | $385 | November 1, 2013 |
| Tenant Rent | $17 | $0 | November 1, 2013 |
| Contract Rent | $____ | $____ | |

If the housing assistance payment to your landlord increased and we have already paid your landlord for the month the change was effective, your landlord will receive the adjustment in the following months housing assistance payment.

**Please remember that you must contact me within 2 weeks if:**

**1) Your household income changes.** If all income is not reported, your rental assistance may be terminated and you will have to repay the money overpaid to your landlord on your behalf. Per HUD regulations, we will verify the information you report to us with the HUD Enterprise Income Verification System, the Social Security Administration and other income reporting agencies.

**2) Your household members change.**
     a) A household member moves out
     b) A birth or adoption. You must mail us a copy of the new member's Birth Certificate and Social Security Card within two weeks.
     c) If you want to add a member to your household who is 18 years of age or older you must notify us prior to them moving into your unit. We will require a criminal background check and your landlord's approval before we add them to your case.

**3) You receive an eviction notice.**

If you receive public assistance, food stamps, or Social Security Income (SSI), please report your new rent share to the Department of Social Services immediately. If you require a further explanation of this change, please call me at 562-2477 Ext. 231. If you disagree with this rent determination you may request an informal hearing in writing within 14 days from the date of this notice. Our hearing procedures are attached.

Sincerely,

*Kim Brucie*

Kim Brucie

Scott Wilkins
5811 Unionville Rd
Bath, NY 14810

EXHIBIT **F**

*"Equal Housing Opportunity"*



NeighborWorks®
CHARTERED MEMBER

 

United Way

EXHIBIT "G"

# HAP Year -To-Date Payments
## Steuben Program Administrator Office

Landlord: WILKINS, SCOTT
Landlord Id: 630

Participant: BARROS CLYMO, MISTY
Log No: 4130

Project No: NY904VO0095
Program: Voucher

### 2013 Monthly Payment

|               | Jan | Feb | Mar  | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---------------|-----|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Rent:         | 0   | 0   | 1155 | 385 | 385 | 385 | 385 | 385 | 368 | 368 | 385 | 385 |
| HO/Util:      | 0   | 0   | 63   | 21  | 21  | 21  | 21  | 21  | 0   | 0   | 235 | 235 |
| Adj:          | 0   | 0   | 0    | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   |
| LL- Other:    | 0   | 0   | 0    | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   |
| Partic-Other: | 0   | 0   | 0    | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   |
| Vac/Damage:   | 0   | 0   | 0    | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   | 0   |

Total Landlord Payments:  $4,586.00

Total Participant Payments:  $638.00

 EXHIBIT G

# EXHIBIT "H"

## HAP Year -To-Date Payments

### Steuben Program Administrator Office

Landlord: WILKINS, SCOTT
Landlord Id: 630

Participant: BARROS CLYMO, MISTY
Log No: 4130

Project No: NY904VO0095
Program: Voucher

### 2014 Monthly Payment

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent: | 385 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HO/Util: | 44 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Adj: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LL-- Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Partic-Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vac/Damage: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Total Landlord Payments: $385.00

Total Participant Payments: $44.00



# EXHIBIT "I"

# THREE (3) DAY NOTICE TO PAY RENT OR QUIT

TO: _Misty Clymo_

AND TO ANY AND ALL OTHER OCCUPANT(S), INCLUDING, BUT NOT LIMITED TO, DOES I THROUGH 10, INCLUSIVE.

Address of Premises:
_8048 A Kanona Rd_ Apt. No. _____
_Avoca    NY    14809_

NOTICE IS HEREBY GIVEN that within THREE (3) DAYS after service of this notice upon you, you are required to deliver up possession of the above described premises to the undersigned or agent or pay the total sum of $ _450.00_ to the undersigned or agent of the premises.

The sum you are required to pay is for the rent due and unpaid as follows:

$ _165+40.00 late fee_ for the period _Nov_ to _2013_
$ _____ for the period _____ to _____
$ _165+40.00 late fee_ for the period _Dec_ to _2013_
$ _____ for the period _____ to _____

Unless you have paid the full amount enumerated above or vacated and delivered possession of the premises within THREE (3) DAYS after service of this notice on you, an action in UNLAWFUL DETAINER will be instituted against you to recover possession of the premises and to have the rental agreement under which you hold the premises forfeited and to recover rents and statutory penalties together with court costs and attorney fees.

$40   Service   Fee

DATED: _12/6/13_ OWNER/AGENT: _Vlime LLC_

EXHIBIT I

Copyright 1999 Landlord Services, Inc.

# EXHIBIT "J"



P.O. Box 31                  P.O. Box 451
Bath, NY 14810              Big Flats, NY 14814
T: 607-776-7664            T: 607-562-2477
F: 607-776-9118            F: 607-562-3856

**www.ArborDevelopment.org**

December 11, 2013

Scott Wilkins
5811 Unionville Rd.
Bath, NY 14810

Dear Mr. Scott Wilkins:

On December 4, 2013, we were notified that you were charging your tenant, Misty Barros-Clymo, rent in excess of the amount determined by our agency. You signed a Housing Assistance Payments (HAP) Contract (enclosed) with Arbor Housing and Development, which took effect January 1, 2013, stating the initial rent to owner is $385. We notified you by letter (enclosed) on February 4, 2013, that your tenant's share of rent was $0 and our housing assistance payment to you was $385. You also signed a lease (enclosed) with your tenant effective January 1, 2013, with a rent of $385.

Misty Barros-Clymo is stating that you have asked her to pay $165 each month since January 1, 2013. Per conversation with Barbara Wilkins on December 10, 2013, when she called regarding non-payment of rent from Ms. Barros-Clymo for the month of November 2013 and December 2013, she stated she owed $165 for each month. Ms. Barros-Clymo had a rent portion due of $0 for each month, except for the months of September 2013 and October 2013 which her portion was $17. Mrs. Wilkins admitted in charging rent of $550 each month, an over charge of $165 each month January 2013 – August 2013, $148 each month September 2013 and October 2013. By accepting the additional rent, you are in violation of the HAP contract:

> Per terms of the HAP contract, in *Section 8 Owner Certification*: "During the term of this contract, the owner certifies that: d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term".

> Per terms of the HAP contract, in *Section 5e (Tenancy Addendum) Family Payment to Owner*: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner."

> Per terms of the HAP contract, in *section 10 Owner's Breach of HAP Contract*: a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner: (1) "If the owner has violated any obligation under the HAP contract" . . .



"Equal
Housing
Opportunity"

Building Independence. Creating Housing Options.

In addition, you are obligated by the terms of the HAP contract to return the $165 per month for the months of January 2013 through August 2013 and $148 per month for September 2013 and October 2013 totaling $1,616 to Ms. Barros-Clymo per *Section 5f Family Payment to Owner*: "The owner must immediately return any excess rent payment to the tenant".

We are requesting that you please provide us with proof that you have returned $1,616 to Ms. Barros-Clymo by December 27, 2013. If you do not reimburse your tenant by the deadline provided we will have no choice but to exercise administrative discretion permissible under the terms of the HAP Contract and terminate the HAP contract effective January 31, 2014.

The following Regulations are being provided to you for your reference:

HUD Regulations 24 C.F.R Part 982 Subpart J Housing Assistance Payments Contract and Owner responsibility 982.451(b)(4)(i) states, "The part of the rent to owner which is paid by the tenant may not be more than: (A) The rent to owner; minus (B) The PHA housing assistance payment to owner. (ii) States, "The owner may not demand or accept any rent from the tenant in excess of this maximum, and must immediately return any excess rent payment to the tenant".

HUD Regulations 24 C.F.R Part 982 Subpart G PHA disapproval of owner 982.306 (c) states, "In its administrative discretion, the PHA may deny approval of an assisted tenancy for any of the following reasons: (1) The owner has violated obligations under a HAP contract under Section 8 of the 1937 Act 42 U.S.C. 1437f".

Please be advised, Arbor Housing and Development may still choose to exercise its administrative discretion and not enter into any future HAP contracts with you. This decision will not affect any HAP contracts that are currently in place other than for your tenant, Ms. Barros-Clymo.

We at Arbor Housing and Development realize that you have been a participating owner of our Housing Choice Voucher rental assistance program for many years and acknowledge the opportunities you have given our program participants by providing them with decent, safe and sanitary housing. However, we cannot overlook the gross disregard for program regulations.

Sincerely,

*Kim Brucie*

Kim Brucie
FSS Coordinator

Encl.

Cc Pat Cook/Betsy Green

Misty Barros-Clymo
8048 Kanona Rd., Apt. A
Avoca, NY 14809

EXHIBIT "K"

# THREE (3) DAY NOTICE TO PAY RENT OR QUIT

TO: _Misty Barros Clymo_

AND TO ANY AND ALL OTHER OCCUPANT(S), INCLUDING,
BUT NOT LIMITED TO, DOES I THROUGH 10, INCLUSIVE.

Address of Premises:
_8048 A Kanona Rd_ Apt. No._____
_Avoca NY 14809_

NOTICE IS HEREBY GIVEN that within THREE (3) DAYS after service of this
notice upon you, you are required to deliver up possession of the above
described premises to the undersigned or agent or pay the total sum of
$_255 00_ to the undersigned or agent of the premises.

The sum you are required to pay is for the rent due and unpaid as fol-
lows:

$_165 00 + 50 00 late fee_ for the period _Jan_ to _2014_
$_____ for the period_____ to _____
$_____ for the period_____ to _____
$_____ for the period_____ to _____

Plus $_40 00_ Service Fee

Unless you have paid the full amount enumerated above or vacated and
delivered possession of the premises within THREE (3) DAYS after service of
this notice on you, an action in UNLAWFUL DETAINER will be instituted against
you to recover possession of the premises and to have the rental agreement
under which you hold the premises forfeited and to recover rents and statutory
penalties together with court costs and attorney fees.

Reasons For Eviction
(1) Non payment of Rent
(2) Rental Subsidy will no longer pay your rent
(3) Numerous complaints from neighbors
(4) Over occupied at premises
(5) Calls From State Police of Drug Activity

DATED: _1/14/14_   OWNER/AGENT: _Vtime LLC_

Copyright 1999 Landlord Services, Inc.

EXHIBIT K (3DP.PM6)

# EXHIBIT "L"



**Arbor**
HOUSING AND DEVELOPMENT

P.O. Box 31
Bath, NY 14810
T: 607-776-7664
F: 607-776-9118

P.O. Box 451
Big Flats, NY 14814
T: 607-562-2477
F: 607-562-3856

**www.ArborDevelopment.org**

January 29, 2014

Misty Barros-Clymo
8048A Kanona Back Rd.
Avoca, NY 14809

Dear Ms. Barros-Clymo:

This letter is to inform you that our agency will not be terminating your rental assistance effective January 31, 2014 as previously stated. The HAP contract between this agency and Scott Wilkins has been terminated effective January 31, 2014, and you will be required to move from your current rental unit in order to continue to receive rental assistance.

You are required to attend a move appointment at our office in order to begin the move process. The FSS Coordinator Kim Brucie will contact you to schedule the appointment.

If you have any questions, please contact Kim Brucie at (607) 562-2477 ext. 231. Thank you.

Sincerely,
Heather Gokey
HCV Quality Assurance Manager

Cc: Southern Tier Legal Services
Attn: Mr. David Kagle
104 East Steuben Street
Bath, NY 14810



*"Equal Housing Opportunity"*





CHARTERED MEMBER



United Way
of the Southern Tier

Building Independence. Creating Housing Options.